IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 18, 2013 Session

IN THE MATTER OF DAKOTA M. S.[1]

Appeal from the Juvenile Court for Jackson County
No. 2011JV24    John R. Officer, Judge

No. M2012-01043-COA-R3-PT - Filed February 5, 2013

Mother and Father appeal the termination of their parental rights. Mother and Father's rights were terminated on grounds of substantial non-compliance with the permanency plans and persistence of conditions. Finding no error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Kelsey Austin Miller, Cookeville, Tennessee, for the Appellant, Heidi M. S.

William L. Draper, Gainsboro, Tennessee, for the Appellant, William R. S.

Robert E. Cooper, Jr., Attorney General and Reporter; Mary Byrd Ferrara, Assistant Attorney General, for the Appellee, Tennessee Department of Children's Services.

Sheila L. O'Regan, Granville, Tennessee, as Guardian Ad Litem for, Dakota M. S.

**OPINION**

**I. Facts and Procedural History**

Heidi M. S. ("Mother") and William R. S. ("Father") are the parents of Dakota, born June 21, 2010. Four days after her birth, the Department of Children's Services ("DCS") initiated a proceeding to have Dakota adjudicated dependant and neglected and placed in the

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

protective custody of DCS. The petition alleged that DCS received a referral regarding Dakota the day after her birth and that an investigation revealed that Mother and Father did not have a suitable home for Dakota, that Mother and Father had previously had four children removed from their custody,[2] that Mother was not receiving treatment for her Attention Deficit and Hyperactivity Disorder and Manic Depressive and Bipolar Disorder, and that, as a result of the investigation, Dakota had been taken into emergency custody on June 24 pursuant to Tenn. Code Ann. § 37-1-113.[3] The court entered a protective custody order and placed Dakota in the temporary care and custody of DCS on June 25.[4]

---

[2] In 1999, DCS filed a Petition for Temporary Custody regarding Mother and Father's three older children due to the children's failure to thrive, and the children were placed in DCS custody. After a failed trial home visit in September 2000, the children returned to DCS custody. Father and Mother had another child in 2002 who was removed from their custody at birth. Mother and Father subsequently surrendered their parental rights to these four children pursuant to Tenn. Code Ann. § 36-1-111 and the court entered an order granting complete custody, control, and full guardianship to DCS on April 11, 2002.

[3] Tenn. Code Ann. § 37-1-113(a) provides:

(a) A child may be taken into custody:
(1) Pursuant to an order of the court under this part;
(2) Pursuant to the laws of arrest;
(3) By a law enforcement officer, social worker of the department of human services, or duly authorized officer of the court, if there are reasonable grounds to believe that the conditions specified in § 37-1-114(a)(2) exist; or
(4) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child has run away from the child's parents, guardian or other custodian.

Tenn Code Ann. § 37-1-114(a)(2) provides:

(a) A child taken into custody shall not be detained or placed in shelter care prior to the hearing on the petition unless there is probable cause to believe that the child:
* * *
(2) Is a neglected, dependent or abused child, and in either case the child's detention or shelter care is required because the child is subject to an immediate threat to the child's health or safety to the extent that delay for a hearing would be likely to result in severe or irreparable harm, or the child may abscond or be removed from the jurisdiction of the court, and in either case, there is no less drastic alternative to removal of the child from the custody of the child's parent, guardian or legal custodian available that would reasonably and adequately protect the child's health or safety or prevent the child's removal from the jurisdiction of the court pending a hearing.

[4] A preliminary hearing on the custody petition was set for June 28, at which time the hearing was continued to July 6. On July 6 Mother and Father waived the preliminary hearing and an adjudicatory

(continued...)

A permanency plan was developed by DCS, Mother, and Father on July 19, 2010, with the goal that Dakota return to her parents' custody. The permanency plan included the following desired outcomes: Mother and Father would maintain a home that is safe and healthy for the child; Mother and Father would be able to financially support themselves and provide for Dakota's basic needs; Mother and Father would appropriately parent Dakota; Dakota would have a bond with Father and Mother; Mother and Father would be mentally and emotionally stable; and Dakota would be physically healthy and have all of her medical needs met. Both parents signed a copy of the Criteria and Procedures for Termination of Parental Rights and the plan was ratified on August 7.

The permanency plan was revised on January 25, 2011. The revision added the goal of adoption and the desired outcome that Dakota achieve permanency in a timely manner. While both parents signed the revised plan, they marked a box stating that they did not agree with the revised plan and refused to sign a copy of the Criteria and Procedures for Termination of Parental Rights that was provided to them. The record does not show that either parent raised a concern regarding DCS' efforts, or lack thereof, in addressing the requirements placed on DCS in the plan. The revised plan was ratified at a hearing held on May 3 at which Mother and father were present and represented by counsel; in the ratification order, the court found that Mother and Father were "in agreement with the plan."

On February 15, 2011, the court held an adjudicatory hearing on the dependent and neglect proceeding; the order from the hearing recites that Mother and Father stipulated to the allegations in the petition. The court entered findings of fact and, on the basis of same, held Dakota to be dependent and neglected; the court ordered that DCS retain temporary legal custody.

On April 5, 2011, DCS filed a petition to terminate Mother's and Father's parental rights. With respect to both Mother and Father, the petition alleged the following grounds for termination: abandonment by failure to establish a suitable home; failure to comply with the permanency plan; persistence of conditions; and parental incompetence. The petition also alleged that Father had abandoned Dakota by failure to support. Mother filed her answer on June 25.[5]

---

[4](...continued)
hearing was set for August 3. The adjudicatory hearing was held on February 15, 2011; the record does not show the reasons the hearing was continued to that date.

[5] Father's Answer is not found in the record.

A hearing was held on January 18, February 24 and 29, 2012. The court entered a Final Decree of Guardianship on April 2 which terminated the parental rights of Father and Mother on the grounds of substantial non-compliance with the permanency plans and persistence of conditions and based upon the best interest of the child. The court found that DCS had made reasonable efforts to assist Mother and Father.

Mother enumerates the following issues on appeal:

I.     Whether there is clear and convincing evidence that the grounds for termination of parental rights of the appellant exist as a matter of law for the following:
(A)     Substantial non-compliance with permanency plan
(B)     Persistence of conditions

II.     Whether there is clear and convincing evidence that termination of the appellant's parental rights was in the child's best interests.

III.     Whether DCS provided reasonable efforts.

The statement of issues contained in Father's brief is argumentative and of no assistance to this court.[6] To the extent the court terminated Mother's and Father's rights on the same grounds, we will treat the issues being raised by Mother as having been raised by Father. Inasmuch as the case before us does not involve the four children as to whom Mother and Father surrendered their parental rights to in 2002, we will not address those issues.

---

[6] Father states his issues in this fashion;

Was it demonstrated at trial by clear and convincing evidence that the alleged parental nutritional incompetence is the cause of Dakota's being a skinny little kid. And, that, therefore, the Mother and Father, [], are incompetent and incapable of raising Dakota
Or
Was it demonstrated at trial by clear and convincing evidence that alleged parental nutritional incompetence had little or nothing to do with all the [] children being small?
Or
Was the State's taking of the previous four [] children (1999-2002) the result of simple incompetence?
Or
If the State's taking of the four [] children (1999-2002) was simple incompetence, was the taking of Dakota who turned out to be a small skinny kid after 18 months in state custody, gross incompetence?

## II. Standard of Review

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007), *cert. den.*, 168 L.Ed.2d 729 (2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982); *State Dep't of Children's Services v. C.H.K.* 154 S.W3d 586, 589 (Tenn. Ct. App. 2004).

Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent and of the child; and the parent shall have no right thereafter to have any relationship, legal or otherwise, with the child. Tenn. Code Ann. § 36-1-113(*l*)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, (1996) (quoting *Santosky,* 455 U.S. at 787, (Rehnquist, J., dissenting)).

The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004); *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "This heightened standard . . . serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A.*, 980 S.W.2d at 622.

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de*

*novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

### III. Discussion

A. Reasonable Efforts of DCS

Mother contends that DCS failed to make reasonable efforts to assist the parents in several respects: that DCS was "guilty of simply providing a list of services and sending [the] parents on their way"; that DCS failed to visit the parents' home between July 2010 and December 2010; that DCS held visits at a Dairy Queen while it was under construction, thereby preventing them from showing their parenting skills; that DCS contacted the Life Care worker only once [7]; that DCS placed Tennessee Early Intervention Services ("TEIS") in the foster parents' home but not in the birth parents' home; and that DCS failed to "use social work methods to put in a support system" for the parents.

"Reasonable efforts" is defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors courts are to use in determining reasonableness include:

> (1) the reasons for separating the parents from their children; (2) the parents' physical and mental abilities; (3) the resources available to the parents; (4) the parents' efforts to remedy the conditions that required the removal of the children; (5) the resources available to the Department; (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal; and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d 148, 158–59 (Tenn. Ct. App. 2007) (*citing In re Giorgianna H.*, 205 S.W.3d 508, 519). The reasonableness of DCS's efforts depends upon the circumstances of the particular case. *In re Giorgianna H.*, 205 S.W.3d at 519.

---

[7] Carolyn Wilson, a case manager for Life Care, testified that Life Care is an agency which provided medication management and counseling services to Mother upon referral from DCS. Mother fails to explain why the lack of contact between DCS and Life Care constituted a failure on DCS's part. Additionally, Ms. Roberts testified that she received a report from Life Care regarding Mother each month.

With respect to DCS's efforts, the trial court stated:

The Court finds that the State of Tennessee, Department of Children's Services has made reasonable efforts to assist [Mother and Father] in: (1) visiting the child; (2) establishing a suitable home for the child; (3) complying with the requirements in the permanency plan; and (4) remedying the conditions that necessitate foster care.

The court found that DCS made the following efforts to assist Mother and Father:

. . . preparing permanency plans for the child, explaining the plan requirements to the parents, making the child available for visitation, arranging and paying for therapeutic visitation, arranging and paying for a clinical parenting assessment for both parents, arranging and paying for psychological evaluations for both parents, assisting the parents in setting up mental health counseling, assisting the mother in setting up medication management, and requesting statements of cost from the parents to apply for financial assistance through DCS for testing the water and obtaining appropriate heating in the home. In addition to the parenting training and therapeutic visitation, DCS case managers Natalie Roberts and Maggie Lundholm repeatedly prompted and demonstrated proper parenting techniques, including proper feeding of the child and developmental activities to stimulate the child's development.

The evidence shows that DCS met with Mother and Father within a month of Dakota's removal to develop a permanency plan in which responsibilities for both the parents and DCS were established; this plan was approved by the court. The plan set forth a standard supervised visitation schedule of two hour visits twice per month.[8] Initially, the meetings took place at the local Dairy Queen because the parents' home was not ready for visitation to take place there[9]; the Dairy Queen was under construction at the time. Beginning in March

_____

[8] Beginning in June 2011, visitations were extended to three hour visits twice per month.

[9] In the Adjudicatory and Dispositional Hearing Order for Temporary Custody, the court found that Mother and Father were living in a camper without water or electricity at the time Dakota was born; the family was conducting repairs on a mobile home that needed to be secured and have water/sewage and air conditioning installed before it could be inhabited. Ms. Roberts testified that she visited the mobile home on July 15 and that, at that time, Mother and Father were still living in the camper, the mobile home did not have air conditioning, the back deck was falling off the mobile home, and there were wires trailing from the mobile home to the camper; Ms. Roberts informed the parents that they would need to fix these concerns.

(continued...)

2011, however, the visits took place in the home until their parental rights were terminated in April 2012.

In order to further assist Mother and Father in learning appropriate parenting techniques, DCS also arranged for and financed twice-monthly two-hour therapeutic visitation sessions between October 2010 and January 2011 and two two-hour follow-up therapeutic assessments in April 2011.[10] During each therapeutic session, the case worker observed Mother and Father interact with Dakota and provided prompts and instruction regarding proper parenting techniques and developmental milestones. During supervised visitation, DCS caseworkers provided instruction and demonstrated parenting techniques to Mother and Father. DCS also provided and funded a eight-week parenting course for Mother and Father. Maggie Lundholm, the second DCS caseworker, testified that TEIS services were not provided to Mother and Father because TEIS was a separate agency and lacked the resources to provide services to birth parents where the child was not placed in the home.

Mother contends that, "The psychological examiner recommended . . . assessment using social work methods basically to help put in a support system" and that this recommendation was not followed by DCS. This is a mischaracterization of the testimony of Dr. Scott Herman, the psychologist who performed an evaluation of Mother and Father. Although Mother has not cited specific testimony of Dr. Herman at which she contends he recommended "a support system," our review of his testimony reveals the follow question and answer after he summarized the results of his testing:

> Q:   What were your conclusions regarding [Mother] and her ability to parent the child?
> A:   Most people in this range can do well and learn the tasks of caregiving. They may have difficulty in new or novel situations and the people that I've worked with in this range that have successfully raised children have done so with additional support. They can do quite well with a social support network.

---

[9](...continued)
Ms. Roberts testified that she visited the home on November 5, but no one was home. She testified that on her December 9 visit she observed conditions relative to how the home was being heated which raised safety concerns.

[10] The record shows that the Foster Care Review Board requested the Tennessee Family and Child Alliance ("Alliance") to conduct therapeutic visitation services for Mother and Father to address "infant development, care, and nutrition." The sessions conducted by Alliance case workers substituted for Mother and Father's visitation sessions, which were supervised by DCS case workers. Alliance's case notes were introduced at the trial.

Dr. Herman was not making a recommendation for treatment but, rather, was explaining the possibilities for parenting of a person in Mother's range of intelligence.

In his assessment, after summarizing Mother's history and the outcome of her diagnostic testing, Dr. Herman concluded:

> Since [Mother's] ability to serve as a solitary caregiver is marginal, the ability of [Mother and Father] to parent as a couple must be assessed further. This is best done using a social work approach of instruction and direct observation.

Dr. Herman's testimony provided further clarification as to the meaning of this conclusion, as follows:

> Q: In your final sentence on [Mother's] report, you indicated that her ability as a solitary care giver was marginal, and that their ability to parent as a couple should be further assessed and this is best done using a social work approach of instruction and direct observation. What did you mean by that?
>
> A: That is typical of while she has the ability to learn these skills that does not mean she has acquired these skills. So basically, it's done by making sure that she is shown the skills and then watching her to assess how she can perform them.

The testimony of both DCS social workers as well as the case notes and Alliance records show that the method of instruction and observation referenced by Dr. Herman was conducted by DCS.

We do not agree with Mother's characterization that DCS "simply provided a list of services" to Mother and Father. From the time that Dakota was removed from the parents' custody until the time that their parental rights were terminated, the parents benefitted from numerous programs and services provided by DCS in order to directly address their ability to appropriately parent Dakota. The evidence fully supports the trial court's determination that DCS made reasonable efforts to assist the parents in developing their ability to parent Dakota.

B. Substantial Noncompliance with the Permanency Plans

Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan as follows:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

The standards for reviewing termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) have been discussed by the Tennessee Supreme Court in *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002). *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008) (no Tenn. R. App. P.11 application filed). Mere technical noncompliance by itself is not sufficient to justify the termination of parental rights. *Id.* The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed *de novo* with no presumption of correctness. *Id.* at 546.

The trial court held that Mother failed to substantially comply with the provisions of the permanency plan as follows:

> While [Mother] has physically completed the requirements in the permanency plans, such as attending appointments for assessments, counseling, medication management and parenting education, she has not made the desired changes from the services. She has not demonstrated the ability to care for the child without being instructed to do so. She has not demonstrated during supervised visitation that she has the ability and means to meet the child's basic needs and ensure developmental milestones are met. She does not demonstrate proper parenting of the child during visitation. She had to be reminded to wash her hands after changing diapers. She has not always adequately fed the child during visitation, without prompting. Before the Petition was filed, the child was held on the parents' laps for the two hour visit, with no attempt to encourage development. Senior Psychological Examiner Scott Herman testified that [Mother] was capable of learning from both oral and written instructions and if she continued not to follow through with those instructions it was because she chose not to follow through.

The court likewise held that Father failed to substantially comply with the provisions of the permanency plan and stated as follows:

> While [Father] has physically completed the requirements in the permanency plans, such as attending appointments for assessments and parenting education, he has not made the desired changes from the services. He has not demonstrated the ability to care for the child without being instructed to do so.

He has not demonstrated during supervised visitation that he has the ability and means to meet the child's basic needs and ensure developmental milestones are met. He does not demonstrate proper parenting of the child during visitation. He has not adequately fed the child during visitation, without prompting. Before the Petition was filed, the child was held on the parents' laps for the two hour visit, with no attempt to encourage developmental development. He still must be reminded to buckle the child restraint seat properly into the car. Senior Psychological Examiner Scott Herman testified that [Father] was capable of learning from both oral and written instruction and if he continued not to follow through with those instructions it was because he chose not to follow through.

Mother contends that the trial court erred when it found that Mother and Father failed to substantially comply with the permanency plan because Mother and Father completed many of the requirements of the plan. Mother also contends that "the only hurdle standing in [the parents'] way was Ms. Roberts' . . . subjective view as to their parenting skills . . ." and that "DCS simply did not give her a chance to demonstrate her skills without prompting the Mother first, and then developing a record that would reflect negatively on Mother."

The court found, and all parties agree, that Mother and Father physically completed many of the tasks listed in the permanency plan. However, such efforts on the part of Mother and Father do not absolve them of responsibility for substantially complying with the *goals* of the permanency plan. As noted by this court in *Tenn. Dep't of Children's Servs. v. C.D.W.*, 2005 WL 94468, at *10 (Tenn. Ct. App., Jan. 11, 2005):

> Mother's permanency plans did require that she attend parenting classes, treatment programs and the like. All of these requirements were in place to achieve one ultimate goal: for Mother to provide a safe and stable environment to properly raise her children. . . . It makes no difference how many parenting classes are completed if the parent is incapable or unwilling to learn anything from the classes and adjust his or her behavior accordingly.

Accordingly, we will assess whether clear and convincing evidence was presented to support the trial court's conclusion that Mother and Father failed to achieve the goal of the plan that they appropriately parent Dakota.

Natalie Roberts, a family service worker for DCS, testified that she was assigned to work with Mother and Father between June 24, 2010 and July 31, 2011. Ms. Roberts testified that each time she supervised visitation, the parents had to be continually prompted to meet Dakota's basic needs such as feeding and diaper changes; that she had to repeatedly

instruct Mother and Father as to basic skills such as preparing a bottle, changing diapers, and installing the car seat; and that the parents were not responsive to instructions regarding Dakota's special needs with respect to feeding and nutrition.[11] Ms. Roberts' testimony is supported by her case notes.

Ms. Lundholm, who took over the case from Ms. Roberts on August 1, 2011, testified that she was aware of the parents' concern that Ms. Roberts would intervene before the parents had a chance to demonstrate their parenting skills; accordingly, she purposely "stayed back and would not intervene unless it was necessary" during her first few visits. Ms. Lundholm testified that, despite her efforts to allow the parents to demonstrate parenting skills on their own, she also had to reiterate instructions regarding basic child care such as hand washing when transitioning from diaper changing to preparing meals, installing the car seat correctly, and the appropriate way to hold a child who is drinking a bottle. She further testified that Mother and Father failed to follow through in helping Dakota meet her developmental milestones and nutritional requirements. Although Ms. Lundholm testified that the services provided to Mother and Father had helped, she concluded that the parents lacked "the ability to anticipate needs without the needs being pointed out by someone else."[12]

---

[11] Testimony showed that Dakota had difficulty in consuming the daily amounts of calories and fluids necessary for her development. Accordingly, all caretakers of Dakota had been instructed regarding the importance of feeding and providing fluids.

[12] Ms. Lundholm testified further as to the significance of these matters relative to Mother and Father's parenting ability:

Q:   Is it true that the department's business is not to micromanage the raising of children?
A:   Yes, ma'am.
* * *
Q:   And would you agree that your concerns with the minutia, or the details of watching the parenting over a period of time would grow out of the concerns raised by Scott Herman in his report about the intelligence level, the mental illness, and the history with the department?
A:   Absolutely, and that's why the assessment was done, because there were concerns, and then they were substantiated.

Substantiating Ms. Lundholm's concerns, Dr. Herman testified as follows:

Q:   O.K. And if during visitation the DCS case manager and the therapeutic visitation worker are giving [Mother and Father] instructions on how to properly feed a child, how to properly prepare a bottle, and they're continuing after more than a year of

(continued...)

-12-

In addition, the report of Dr. Gerald Kaforey, who prepared a clinical, alcohol and drug, and parenting evaluation of both Mother and Father on August 31, 2010, was admitted into evidence; in it, Dr. Kaforey expressed concerns regarding Mother and Father's parenting ability. With respect to Father, Dr. Kaforey noted:

> [In] early 2001, four of his children were adopted because of neglect, the current child of concern came into custody for neglect as well. [Father] believes he can raise this child; however, history seems to be repeating itself.

Dr. Kaforey made the following recommendation in his report:

> From a parenting standpoint, [Mother] has limited skills and her decisions in life interfere with her ability to make sound decisions for her children as noted in her past. . . . [Father] and [Mother] are nice people, but I do not believe they are capable of raising this child. I would suggest adoption.

The Discharge Summary prepared by Alliance in April 2011, indicated that the parents did meet Dakota's basic needs during the four hour evaluation; however, with respect to areas of continued concern, the summary noted that the parents required prompting or direct instruction regarding Dakota's basic needs.[13] Further, the summary stated that the parents failed to recognize that Dakota was not meeting milestones for her stage of development.[14]

---

[12](...continued)
> these services, continuing the need to repeat those instructions at visitation, does that indicate a problem or concern?

A:      Obviously.

[13] The summary stated:

During the visits on several occasions FSW/CM would give the parents clues indicating what Client might need, for example, she just awoke from a nap, indicating she might need to be changed and fed. When there was no response from Mother the FSW/CM gave instruction, for instance, she might want something to drink, she needs a bib on, she may need her diaper changed, giving the parents the opportunity to follow through.

It has been reported that there is some concern about their ability to recognize clues to care for Client and follow through with some basic and future needs, including development, nutrition, and general care. As reported the family's limited abilities may possibly cause concern in regards to the matter of Client care if some developmental issues are present with Client.

[14]

(continued...)

In his testimony, Dr. Herman opined that if observation showed that Mother and Father could not meet Dakota's basic needs, then they would likewise be unable to meet her special needs.

As evidence of their ability to parent, Mother and Father presented their own testimony and the testimony of their neighbor who allows Mother and Father to babysit the neighbor's grandchild; they also rely on entries in the case notes which record instances where they did not require prompting.

The record as a whole clearly and convincingly shows that the parents have been unable or unwilling to independently demonstrate basic parenting skills as well as the parenting skills necessary for a child with Dakota's specific needs. Consequently, we affirm the trial court's holding that Mother and Father failed to substantially comply with the permanency plans.

C. Persistence of Conditions

Parental rights may be terminated on the basis of "persistence of conditions" as defined by Tenn. Code Ann. § 36-1-113(g)(3)(A) when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

---

[14](...continued)
"Although Mother had been given information on child development stages, they did not appear to recognize that Client [Dakota] did not perform many/most of the markers for her stage of development. When that was suggested to them, they did not appear concerned, although, they participated in observing her and when it was suggested she should be tested they did not comment."

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

A termination proceeding based on the persistence of conditions ground requires a finding by clear and convincing evidence of all three statutory factors. *In re Valentine*, 79 S.W.3d at 549.

In determining that Mother and Father's parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(3), the trial court made the following findings:

> The conditions that led to the removal of the child from the home of [Mother and Father] were not having safe or appropriate housing for an infant, the inappropriateness of the individuals the parents were staying with during the day, the mother's significant mental health issues, her failure to continue treatment and take medications recommended for her mental health issues, both parents lack of parenting skills and history of being unable to parent and provided for the safety and welfare of their other children . . .

> The conditions that prevent the child's return to the parents' home are both parents continued inability to appropriately and safely parent a young child, which is set out in more detail below.

> The parent's ability to properly parent the child is the most important question to be addressed. There are many parallels in the parents' current behavior and parenting practices with their behavior and parenting practices a decade ago when the older children were removed by Tennessee DCS.
>
> * * *
>
> Despite [DCS'] efforts, [Mother and Father] still do not demonstrate an ability and/or willingness to properly and safely parent the child. While their parenting efforts have improved since the Petition to Terminate Parental Rights was filed, the parents still are not consistent in properly parenting the child. . . . Given the parents' history of neglecting older children, their inconsistency in properly parenting the child and short term improvement after the petition to terminate parental rights was filed, it does not appear that any permanent change in ability or attitude has occurred that would make it likely that they would continue to provide for the child's minimal needs once close supervision and scrutiny is removed.
>
> * * *
>
> . . . Observation of visitations over more than a year and a half shows that the parents are not capable of independently parenting this child. It was

-15-

undisputed that failure to properly feed and hydrate the child could quickly result in serious consequences to the child's health. . . . The record before the Court is full of examples of the parents failing to act independently to properly parent the child and the need for regular prompting and intervention by others. Despite extensive services, the parents demonstrated time and again that they could not take care of Dakota without monitoring and assistance.

The proof in this case showed that Dakota is a picky eater, small for her age and developmentally delayed. Testimony showed that Dakota's health could be compromised very rapidly if she was not fed properly, even for a short duration.

Mother contends that the trial court erred in finding persistence of conditions because the court improperly relied on the parents' prior case with DCS and because the parents received conflicting instructions from DCS workers. Mother also contends that "there are currently no conditions that would prevent return of the minor child" to Mother and Father's home and that the "statement that the parents have shown continued inability to appropriately and safely parent a young child is based on Ms. Roberts' subjective opinion and is inconsistent with the observation of other service providers."

As an initial matter, we do not find the court's consideration of the parents' history with DCS to be improper, nor do we consider the court to have relied heavily upon that history as Mother contends. Anna Shirley Bolin and Angie Bullock Brown, who worked with the family when the four older children were removed, both testified as to the circumstances surrounding the children's removal in 1999 and the parents' surrender of the children in 2002. Ms. Bolin testified that the children were originally removed from the home due to a failure to thrive, and that despite the fact that the children did not have trouble growing and thriving in foster care, the children would lose weight when placed back in Mother and Father's home.[15] Ms. Brown testified that she observed an incident where

_____

[15] Ms. Bolin testified as follows:

Q:    What were your concerns in April of 2002 right before the children were finally surrendered? What were your concerns for the safety of those children in [Mother] and [Father's] home?

A:    It was just the food. Even though there would be food in the home there was just the children going home and losing weight. [Mother], when I would ask her to prepare a meal, she seemed to resent that sort of, and not want to. She would slap things around. . . . If they would ask for a drink, and they would ask again maybe 10 or 15 minutes later—my home visits were usually quite long—just having them

(continued...)

-16-

Mother forgot to feed the children prior to a visit to DCS,[16] that Mother reported to her that on one occasion the five-year-old child had drunk out of the toilet for water, and that the children had to be removed following a trial home visit after losing weight. The trial court appropriately considered this prior history as context for Mother and Father's current inability to parent, not as a substitute for proof; further, the evidence is relevant to the determination of whether the conditions which led to Dakota's removal would be remedied to the extent that she could be returned to Mother and Father's custody.

We have reviewed the instances in the record in which Mother contends she received conflicting instructions from the DCS case managers. When viewed in context, these instructions were not conflicting but, rather, were part of continuing instruction in how to appropriately parent Dakota. For example, it is not inconsistent for the case manager to instruct Father that Dakota, who does not like to drink or eat, required constant hydration, and to further encourage him to give her nutritive calories through the fluids, such as milk or juice, and not sugar-free punch; this instruction is consistent with the direction the parents were given that they must make constant efforts to provide nutritious calories to Dakota. Ms. Lundholm testified about her concern regarding the parent's ability to understand the continued instruction they received with respect to Dakota's care:

---

[15](...continued)
> wait, and wait, and then I would observe her serving her husband before the children. And it just seemed like they were not an important thing in that home. The children would ask for a drink and ask for food. They were very small. You would think that they would give them food or drink, whatever they asked for, just to get them to a healthy place.

[16] Ms. Brown testified to this incident as follows:

Q: Was there something that occurred on December 15th of 2000 that cause you concern?
A: Yes. . . . [Mother] brought the kids to the office on the 15th of December 2000. The children wanted some candy because they had seen some chocolates and things that we had sitting around in the office, and they devoured the candy very fast.
* * *
A: . . . They devoured it very fast and I just asked the mother if she fed them breakfast that morning.
* * *
A: . . . And [Mother] stated, "Here kids, I forgot. Mommy has been bad today. I cannot deny you cookies. Mommy forgot to feed you breakfast."
Q: What time of day was this?
A: That was at least mid-day, or early afternoon.

Another concern that I have is comprehension of what is being taught. After our last hearing, I believe it was . . . the daycare owner, that stated because Dakota is such a fussy eater whatever she eats needs to be of high calorie. And during our last visit I had to explain to the parents just because something is high calorie doesn't mean that it is the best nutritional option. So it is not just a matter of high calorie; it is a matter of nutritious calories for the child, because if you have your choice between Cheetos and an apple the Cheetos are going to have more calories but it is not going to really provide any nutrients versus the apple that would. And having to really explain that several times.

The fact that the parents perceive these instructions to be conflicting supports the court's concern regarding their inability to independently parent. Mother's contentions in this respect are without merit.

Mother also contends that "there are currently no conditions that would prevent return of the minor child" to Mother and Father's home and again insists that the conclusion that Mother and Father cannot appropriately parent is entirely based upon Ms. Roberts' subjective opinion. The trial court's conclusion that the parents "demonstrated time and again that they could not take care of Dakota without monitoring and assistance" is supported by the testimony of not only Ms. Roberts, but also the testimony of Ms. Lundholm and Dr. Herman, the Alliance assessment and case notes, the case notes prepared by DCS, and the report prepared by Dr. Kaforey. As we have held earlier, the entire record clearly and convincingly shows that Mother and Father were unable or unwilling to independently demonstrate basic parenting skills as well as the parenting skills necessary for a child with Dakota's specific needs. The same evidence supports a determination that the situation was unlikely to be remedied in the future and that continuation of the parent-child relationship would negatively impact permanency for Dakota.

We affirm the termination of Mother and Father's parental rights on the ground of persistence of conditions.

D. Best Interest of the Child

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) to be followed in

-18-

determining the child's best interest.[17] The list of factors in the statute is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

Mother contends that the trial court erred in concluding that termination is in the best interest of the child because the findings that Mother and Father failed to make lasting adjustments and that Mother and Father suffer from an emotional status that would be detrimental to the child are not supported by the record.

In concluding that termination was in the best interest of Dakota, the court made the following findings:

---

[17] The factors at Tenn. Code Ann. § 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

-19-

[Mother] and [Father] have not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent.

[Mother] and [Father] have failed to effect a lasting adjustment after reasonable efforts by available social agencies for such a duration of time that lasting adjustment does not reasonably appear possible.

A change of caretaker and physical environment is likely to have a negative effect on the child's emotional condition. The child has been in the same foster home since June 24, 2010 and is very bonded to the foster parents. These are the only parents the child has known.

[Mother] and [Father] have committed abuse or neglect toward other children in the family or household. These parents' older children were removed from their custody by the department due to neglect and failure to thrive. Despite services the parents were unable to improve to the point they could care for the children. The parents surrendered parental rights and these children were adopted.

[Mother] and [Father's] mental and/or emotional status would be detrimental to the child and/or prevent them from effectively providing safe and stable care and supervision for the child.

The child is placed in a foster home that wishes to adopt the child.

The child has established a strong bond with the foster parents.

The child needs to be released from the stigma of being a foster child.

When Dakota was removed, DCS had concerns that the parents would not be able to appropriately parent Dakota based, in part, upon the parents' history of neglect of their other children. There was testimony that after a period lasting more than a year in which the parents received parenting training through supervised visitation, therapeutic visitation, and an eight-week parenting course, Mother and Father remained unable to parent with respect to Dakota's basic needs as well as her special needs without monitoring and instruction. Accordingly, the court's conclusion that the parents failed to effect a lasting adjustment is well supported by the record.

The record also supports the court's finding that her "mental and/or emotional status would be detrimental to the child and/or prevent them from effectively providing safe and stable care and supervision for the child." Dr. Herman testified that Mother's ability to parent a child was "marginal." Dr. Kaforey stated in his report that Mother had "limited skills and her decisions in life interfere with her ability to make sound decisions for her children as noted in her past"; Dr. Kaforey recommended adoption for Dakota as to both parents and stated that "I do not believe [the parents] are capable of raising this child." There

is no countervailing proof; contrary to Mother's assertion, the finding is supported by the record.

The evidence demonstrates clearly and convincingly that termination of Mother and Father's parental rights is in the best interest of the child.

## IV. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
RICHARD H. DINKINS, JUDGE